UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

| | | |
|---|---|---|
| CSX TRANSPORTATION, INC. | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | Civil Action No. 4:17-CV-137-JHM |
| | ) | |
| CITY OF SEBREE, KENTUCKY | ) | |
| | ) | |
| DEFENDANT | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S POST-HEARING SUPPLEMENTAL BRIEF
IN SUPPORT OF INJUNCTIVE RELIEF**

**\*\*\*\*\*\*\***

Comes the Plaintiff, CSX Transportation, Inc. (referred to herein as "CSXT"), by counsel, and hereby tenders its Brief in support of Injunctive Relief following the evidentiary hearing conducted March 1, 2018.

This action was instituted by CSX Transportation, Inc. ("CSXT") against the Defendant, City of Sebree, Kentucky (the "City") seeking injunctive relief. The City has threatened criminal enforcement of municipal and state law to prohibit CSXT from performing necessary maintenance on its tracks located at at-grade crossings within the City that will result in raising the tracks by a few inches. CSXT has instituted this action to prevent the City from undertaking such enforcement.

## I.       FACTUAL BACKGROUND

The Court is aware of the facts of this case, and CSXT will therefore only briefly summarize the past events that serve as background to this action. CSXT owns or controls certain real estate located in and through the City of Sebree in Webster County,

Kentucky (the "Railroad Property").  The Railroad Property includes five at-grade crossings located in the City at Jefferson, Webster, Main, Dixon, and Mill Streets.

CSXT's Railroad Property is used as an active railroad corridor and is an essential part of the network of rail lines through which CSXT conducts its interstate commercial operations as a common carrier nationally and through Sebree, Kentucky specifically.  For the safety and integrity of CSXT's federally regulated railroad operations, CSXT conducts regular inspections and maintenance of its tracks and track bed along its lines of operation.  Wayne Roberts, Jr. is the Roadmaster in charge of the segment of tracks that runs through the City.  As a part of his position in overseeing rail crossings and tracks assigned to him, Mr. Roberts determined that the tracks and the track beds supporting them require maintenance in order to comply with the applicable FRA Track Safety Standards, 49 CFR Part 213.  See Affidavit of Wayne Roberts, Jr., ¶¶5-7, attached to the Complaint as Exhibit C.  Due to the condition of the track and track bed, the particular maintenance required will result in raising the tracks at the subject crossings by a few inches.  *Id.* at ¶9.

City officials informed Mr. Roberts that they will not allow any raising of railroad tracks at any of the at-grade crossings within the City.  *Id.* at ¶8.  The reason offered to Mr. Roberts for this prohibition was a 1966 city ordinance and an order from a 1979 lawsuit.  *Id.*  The May 11, 1966 ordinance passed by the City Council of Sebree, Kentucky (the "1966 Ordinance") explicitly prohibited the Louisville and Nashville Railroad Company (CSXT's predecessor and referred to herein as "L&N") from making any change in grade at any of the street crossings in the City of Sebree without first obtaining the approval of the City Council of the City of Sebree.  A copy of the 1966 Ordinance is attached to the Complaint as Exhibit A.  The November 6, 1979 order (the "1979 Agreed Order") was the

result of a lawsuit instituted when L&N conducted some maintenance on tracks at the crossings at Jefferson and Webster Streets, and the City sought to enforce the 1966 Ordinance in the event L&N attempted to alter the grades of crossings at Main Street and Dixon Street. The 1979 Agreed Order provided in relevant part "(A) That the L&N Railroad will not raise the level of the tracks which cross Dixon Street in Sebree, Kentucky. (B) That the L&N Railroad will not raise the level of the Main Street track in Sebree, Kentucky, more than 0.4 feet…. [and] that the terms of this Agreement will be enforceable by the contempt powers of this Court should this Agreement fail to be complied with."  A copy of the 1979 Agreed Order is attached to the Complaint as Exhibit B.

In 2013, CSXT sought to undertake some maintenance that would have raised the tracks at crossings within the City, and the City police responded, threatening to arrest CSXT personnel.  At that time, CSXT chose to undertake alternative minimal maintenance that did not require raising the tracks; however, because of the City's position regarding the crossings, CSXT was not able to replace rail, ties and ballast through the crossings themselves, which it otherwise would have done.

CSXT can no longer defer work at these crossings.  To ensure the safety of the public and of CSXT's rail operations as well, compliance with the applicable FRA Track Safety Standards, necessary repair and maintenance of CSXT's tracks must move forward, repairs which will result in slight raising of the track height.  In a series of meetings and correspondence between the parties in the late summer and fall of 2017, documented in the exhibits to CSXT's Complaint, City officials reiterated their intention to enforce the 1966 Ordinance and the 1979 Agreed Order and at a City Council meeting on October 2, 2017

voted 6-0 to prohibit CSXT from performing any maintenance that would result in the grade of the tracks at the crossings being raised.

CSXT instituted this action for preliminary and permanent injunctive relief ordering and enjoining the City from taking any action to enforce either the 1966 Ordinance or the 1979 Agreed Order, or otherwise interfering with CSXT's railroad operations. The Court, pursuant to FRCP 65(a)(2) consolidated the hearing on CSXT's motion for preliminary injunction with the trial on the merits, and conducted an evidentiary hearing on March 1, 2018. This supplemental brief follows that hearing on the matters before the court and sets forth the basis for CSXT's claims for relief.

## II.    FACTUAL TESTIMONY

At the March 1, 2018 hearing, the Court heard testimony from experts and fact witnesses presented by the parties on the issues before the Court in this action. At the heart of this case are the issues related to the required maintenance of the CSXT tracks in Sebree and the methods available and their relative feasibility, burden and benefits. Specifically, CSXT's expert, Michael McMaster, who has almost forty years of experience as a professional engineer in the railroad industry, testified that the track bed ballast has become fouled, resulting in defects in track condition requiring repair:

> Q. ...But, briefly, could you explain to us, sir, the purpose of this rock/gravel ballast as supporting the structural integrity of railroad tracks as if -- and it's easy for me, but as if I don't know anything about railroad tracks? Why is ballast important? What purpose does it serve?
>
> A. Ballast is a critical component of the track structure. It functions to maintain the geometry, which is the alignment, and profile of the tracks, and it acts as a drainage medium to allow water to freely drain from the track.
>
> Q. What happens if the water does not appropriately drain away from railroad tracks? What cause and effect does that have on the structural integrity of the tracks?

> A. Water which is trapped within the track structure due to the elasticity of the track structure under train loading, the pumping, the side-to-side movement eventually will form pockets of mud. It becomes -- the sub-ballast and ballast becomes soft, and you lose your desired geometry.

Transcript of March 1, 2018 Hearing [DN 19], pp. 15-16. Mr. McMaster reviewed inspection records of the approximately one mile length of track in question in Sebree and identified fourteen defects in track condition as a result of fouled ballast:

> Q. But let's talk about what those records show. You looked at the track inspection records, and you were able to look at, again, approximately Milepost 296 to 297, which encompassed the city of Sebree. What did those track inspection records tell you about the condition of the tracks and the at-grade railroad crossings?
>
> A. I focused on defects that were related to geometry and ballast. Any defects in the turnout that's near the north end of Sebree, while I noticed them, I didn't include those. I found 14 defects that the track inspector saw in three years through those milepost limits. There's actually a 15th one that was just outside Milepost 296. It was 295.95 or something like that. So there was a series of fouled ballast, geometry issues that the track inspector took exception to.
>
> Q. "Fouled ballast," what does that mean?
>
> A. Fouled ballast is where the voids in the ballast become clogged by smaller particles, which reduce the availability for it to drain freely.

Transcript [DN 19], pp. 26-27.

> Q. Based on your review of this three-year history of track inspection records that included, among other things, this one-mile stretch through the city of Sebree, what did 14 FRA track defects tell you about the condition of the tracks within the city of Sebree?
>
> A. That there's some maintenance that has to occur. The tracks are showing fouled ballasts. The track inspector has taken exception to it. That is -- 14 within a three-year period for a one mile stretch of track is highly unusual to be shown on the FRA track inspection reports. It also tells me that it's going to require frequent ongoing maintenance to try to maintain the tracks within the geometry requirements.

Transcript [DN 19], pp. 27-28.

Mr. McMaster explained that, for more than "band-aid-type" maintenance (which is performed by the Roadmaster assigned to the track territory), the railroad's "system production team" would normally perform surfacing repair work every five to seven years. Transcript [DN 19], p. 28. Mr. McMaster testified that the method of correcting significant track geometry defects that have arisen through the development of fouled ballast is to lift the track ties free of fouled ballast and then force ballast back underneath the repositioned ties:

> Q. In addition to a regular surfacing job occurring every five to seven years, in addition to surfacing, is there work that would require the raising of the rails through the city of Sebree? And if so, what's that called?
>
> A. When you look at a system production team, the surfacing team actually raises the track. The surfacing -- the minor dips, they come from the roadmaster and from the division support teams. So you can surface the track, and that's correcting the minor geometry exceptions. You're raising the dips, the low spots, and you're just leveling the track to the existing grade, keeping it as level as you can. But the system production teams, they come through, and they will raise the tracks. And the purpose of raising the tracks is to break the bottom of the tie free from the compacted fouled ballast, and it levels the track again, but it also provides the drainage that's required through the bottom of the tie.
>
> Q. Is it CSX's policy throughout its system, sir, that on a five- to seven-year cycle, the system production teams come through and, with certain equipment, physically lift up the railroad tracks and break the ties away such that there's, for lack of a better term, air between the railroad tie and the ground? Is that the breaking free that you're talking about? A. That is correct. There's an ability to grasp the head of rail. They pull the track up to the desired height. They have tamping paddles that vibrate and squeeze. We don't leave air under the bottom of the tie. But once you raise the tie, you break it free, then the paddles come down on the side of the tie, they squeeze and vibrate and force ballast back underneath that tie.

Transcript [DN 19], pp. 29-30.

The City seeks to prevent such lift-and-surface maintenance to correct the track defects in Sebree. Specifically, the City has claimed that another method called "undercutting" would allow for the removal and replacement of fouled ballast without raising track height. As Mr. McMaster explained "Undercutting is the removal of all ballast from

between the ties, from the end of the tie, and approximately 8 to 8 ¼ inches under the bottom of the tie." Transcript [DN 19], p. 49. Mr. McMaster explained that the ripping process commonly causes damage to underground utilities, whose locations are unknown or imprecisely documented. Transcript [DN], p. 61 ("it is fairly common that you'll hit a wire or a cable crossing or some type of pipe casing, and undercutters don't discriminate between ballast and wires or casings"). Mr. McMaster further explained that undercutting is not desirable because it has a deleterious effect upon track integrity.

> Q. When the production undercutter is used for this system production-type process, this large machine at these long distances, how does that affect the structural integrity of the track? How does it affect the ballast that's supporting the track?
>
> A. From a railroad perspective, undercutting is the last option that we want to do for whatever reason that we have to run it, because it, in fact, greatly weakens the track structure.

Transcript [DN 19], p. 53. Indeed, a 2014 research report from the Kentucky Transportation Cabinet, entitled "Recommendations for Kentucky Transportation Cabinet Railway/Highway At-Grade Crossing Management Practices," discusses the use of undercutting to lower track height in order to address raised or "humped" crossings. "This solution is extremely expensive and involves considerable impact on railroad operations." Transcript [DN 19], p. 57. "Also, the integrity of the track bed support may be compromised." Transcript [DN 19], p. 58. Mr. McMaster confirmed that undercutting was not an effective or desirable option and has a negative impact upon track integrity and railway safety:

> Q. ...Does undercutting affect the -- according to the Kentucky Transportation Cabinet and this research paper, does undercutting affect the structural integrity of the railroad tracks?
>
> A. Absolutely.
>
> Q. It goes on to say in this last paragraph on this section, sir, starting here, "Lowering a track's elevation is rarely the preferred method of matching

railroad and highway elevations to upgrade the rideability and safety of a crossing." Do you agree with that?

A.  Yes, I would agree with it.

Q.  It goes on to say, sir, "This procedure is complicated by the fact that the pavement approaches will need to be reconstructed to coincide with the lowered track. It also requires the installation of a new crossing surface. Benefit-cost analyses of this solution rarely justify its use, and it is generally viewed as an economically ineffective option." Do you agree with that?

A.  Yes.

Transcript [DN 19], pp. 58-59.

Mr. McMaster testified that undercutting, if it were to be used, would take approximately five weeks to complete for the length of the Sebree track at issue. Transcript [DN 19], p. 54. The lift-and-surface process, on the other hand, could be completed in one day. Transcript [DN 19], pp. 67-68. The City's position is that undercutting should be used to maintain the current track height at the crossings, but notably no testimony was offered to counter the impact that undercutting would have upon railroad operations. Specifically, no testimony was elicited to rebut the concerns about effect upon track integrity or the cost or length of time required to complete undercutting through Sebree. Mr. McMaster testified that if CSXT is not able to conduct its lift-and-surface maintenance, then the increased time to maintain and repair the Sebree tracks would have a significant impact upon railroad operations:

Q.  ...If a system production gang is not allowed to go through and perform its regular and periodic maintenance cycle to surface and raise the railroad tracks, is it your opinion that Roadmaster Wayne Roberts and CSX will continue to experience a heightened level of potential FRA defects within the city of Sebree?

A.  There's no doubt they'll continue.

Q. A heightened level of FRA defects, as you documented by way of your review of the track inspection records, does that affect railroad operations?

A. In the fact that it requires work to repair those defects and work requires track time, it does have a detrimental effect to railroad operations.

Q. Do you believe that the surfacing work and the tracks need to be raised at some level -- depending upon the circumstances, at some level of one, maybe even as many as two to three inches throughout the city of Sebree, consistent with the Wayne Roberts affidavit submitted in this case?

A. Yes, I do.

Transcript [DN 19], p. 62.

Q. Undercutting, as compared to surfacing and raising the track, in your opinion, is not a reasonable option under the facts of this case?

A. Undercutting is not a reasonable option.

Transcript [DN 19], p. 63.

Furthermore, upon direct questioning by the Court, Mr. McMaster answered that, even if undercutting were employed to keep the track at its current level, then the parties will face the same fight in another five to seven years, when "lift-and-surface" maintenance would again be called for. Transcript [DN 19], pp. 83-84. In addition, Mr. McMaster noted that the speed and loads of trains in the current day are very different than they were in or around 1979, and undercutting presents safety issues not raised by "lift-and-surface" maintenance:

THE COURT: And the last time this was done, was that in 1978 or '9?

THE WITNESS: I don't know that it was ever done. I saw reference to undercutting in some documentation prepared by the City. It does not tell me the type of undercutting, the length of undercutting, the depth. It doesn't tell me the annual tonnage, the train speed. And it was a Class II based on some of the accident reports, which is a slower train speed. And most likely it was jointed rail. And today you have welded rail. And that greatly raises the risk of buckled track derailments, particularly when you decrease or greatly decrease this track structure that holds the track in line.

So whatever they did back in the '70s, if they did undercutting like they're proposing, is greatly different because the train loads are heavier. It's different, particularly when you have welded rail. This is not an easy

> proposal by the City, and it does reduce train safety for a long period of time.
>
> When you talk -- when he talked about surfacing and the time it takes to stabilize a track, that's usually about 50,000 tons of tonnage trains. On this line, you can get that perhaps in a day or two. But when you undercut, you're going to have problems for months with stability of that track.

Transcript [DN 19], p. 85-86.

On Cross-examination, Mr. McMaster further confirmed the impact and irregularity of undercutting:

> Q. And it [referring to any maintenance that affects ties or ballast] will inconvenience or cause a change of train traffic or speed during those time periods?
>
> A. It may not, or it may go from a minor inconvenience to something that if you'd undercut through Sebree, it would be a major disruption to train operations.

Transcript [DN 19], p. 67.

> Q. Okay. Now, your discussion about undercutting, that it is not the preferred method, but it is a method that is available and is used by CSX to correct fouled, contaminated ballast locations such as the Sebree location?
>
> A. No, CSX does not use undercutting to correct something like through the city of Sebree. They have undercut switches. We have undercut entrance to tunnels. And this is spot undercutting. When I say they do undercut, it's 100 to 200 feet max in length, and it has used a switch undercutter or an excavator with a bar on it to undercut. The use of a production undercutter, to my knowledge, is only for vertical clearance restrictions.
>
> Q. Are you aware of whether or not other train companies use undercutting, not just CSX, to repair areas that have fouled or contaminated ballast?
>
> A. In an area like Sebree, no.

Transcript [DN 19], p. 72.  And on cross-examination, the City's expert, David Clarke, testified that he agreed with statements from the CSX maintenance of way manual highlighting concerns about the effect of undercutting on track integrity:

> Q. The top, "Undercutting, whether spot or out of face, causes the greatest loss of lateral resistance." Do you agree with that?

A. Yeah. I don't disagree with that statement.

Q. "Undercut track is very susceptible to surface deviations and track buckling if not properly protected." Do you agree with that?

A. Certainly.

Transcript [DN 19], p. 121.

The City has throughout this case taken the position that the crossings as they currently exist are unsafe due to their "humped" profile. Indeed, that appears to be the intended purpose of the testimony and affidavits elicited from the City's highway expert, Ken Agent, and Transportation Director Jill Simpson. The City raises this point as support for why the track at the crossings should not be further raised. In response, CSXT has suggested that if the City regards the crossings as unsafe, then it should alter the approaches to eliminate or mitigate the humped nature of the crossings. The City's expert witness, David Clarke, conceded that maintaining the status quo with respect to track height through undercutting would not improve the condition, and addressing the roadways would be one solution to the humped conditions complained of by the City:

Q. And if what you're suggesting is actually undertaken according to Mr. Redding and the undercutting is performed that doesn't lower the track but maintains the status quo, presumably that -- to the extent the City of Sebree contends this, that unsafe condition will remain?

A. That could be.

Q. A remedy for that unsafe condition would be for the City of Sebree to budget money, consistent with its obligations as the governing road authority, to improve the grade of the roads to the crossing, in conjunction with the railroad perhaps adding asphalt out to the end of its right-of-way? That could happen?

A. That's a possibility.

Transcript [DN 19], pp. 116-117.

Mr. Agent, for his part, testified that, as the streets are currently situated, then "feathering" (gradually adjusting the slope of the roadway as it approaches a crossing) at least two of the crossing locations is not feasible. Transcript [DN 19], p. 163. CSXT has in response proposed that those crossings might be closed, because the affected streets have alternative access at other crossings, and traffic can be re-routed. The City has resisted that option. Mr. McMaster testified that Spring Street could be closed at the intersection of Jefferson, and houses there would have continued alternative access one block south. Transcript [DN 19], pp. 36-37. Mr. Agent conceded that closing streets where alternative access is available is a possible solution. Transcript [DN 19], p. 167-169 ("Q. Okay. And that could be done. In a way to try to find a solution to what Sebree perceives to be a problem by way of the approaches to these crossings, that's a solution; correct? A possible solution. A. At those two crossings, that is a possible solution").

Despite the City's position as to the asserted danger of the crossings, however, testimony also made plain that the City has, to date, not taken any steps to restrict traffic or otherwise address the condition with respect to any mechanisms under its control and authority. The City has not installed or improved any signage restricting traffic at the crossings (there is a lone "No trucks" sign on one street). Mr. Agent testified that "We haven't got to that point to talk about that yet." Transcript [DN 19], p. 173. Ms. Simpson for her part acknowledged that the City had altered its bus routes several years ago to circumvent the Mill (to accommodate buses with undercarriage units for transporting sports equipment) and the Dixon Street crossings (based upon vision issues with a blind curve, not the humped crossing). Transcript [DN 19], pp. 189-190. Ms. Simpson testified that if the need arose, then

bus routes could be altered to accommodate changes in transportation routes.  Transcript [DN 19], p. 195.

In summary, the issue before the court as established through the testimony and affidavits of records is that in order to comply with relevant federal track safety standards CSXT needs to conduct maintenance work on its tracks, maintenance that will raise the height of its tracks at specific crossings by a couple of inches.  The City does not want to bear the expense or inconvenience of accommodating any change to the profile of the crossings, either to "feather" its approaches, close streets at crossings as appropriate, or limit or alter traffic patterns at the crossings – all routine actions taken by municipalities across the country.  Rather than address its responsibility as to the crossing roadways, the City instead seeks to prohibit CSXT from employing the appropriate method of repair and instead direct CSXT to employ a methodology that will have significant impact on CSXT safety and operations.  The City has made clear its intent to utilize law enforcement and resources of governmental control to enforce that position and, thereby, regulate interstate rail transportation.  As argued more fully hereinbelow, the City does not have that authority.

### III.   ARGUMENT

Federal Rule of Civil Procedure 65 governs actions for injunctive relief, and the same standard for grant of a preliminary injunction applies with respect to a permanent one.  *American Civil Liberties Union of Kentucky v. McCreary County*, 607 F.3d 439, 445 (6th Cir. 2010) ("with the exception that [for a preliminary injunction] the plaintiff must show likelihood of success on the merits, rather than actual success").  The Sixth Circuit Court of Appeals has held that in deciding a motion for a preliminary injunction, the court should consider "(1) whether the movant has a strong likelihood of success on the merits; (2) whether

the movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction" *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000) (citing *McPherson v. Michigan High Sch. Athletic Ass'n*, 64 F.3d 453, 459 (6th Cir. 1997) (en banc)); *Barry v. Lyon*, 834 F.3d 706, 720–21 (6th Cir. 2016) ("[A] plaintiff seeking injunctive relief [shall] establish: '(1) that it has suffered an irreparable injury; (2) that remedies available at law ... are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'") (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)).  While a court should consider each of these elements, no one factor is determinative, and the exercise of proper judgment entails a review of all elements to determine whether the balance of equities weighs toward granting the injunction.  *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537-38 (6th Cir. 1978).

      **A.**    **CSXT has Demonstrated the Merit of Its Claim for Permanent Injunctive Relief**

        The City asserts that its 1966 Ordinance and the 1979 Agreed Order serve as legal basis for prohibiting CSXT from maintaining its tracks in any way that would raise the tracks under any circumstances, under pain of criminal or contempt enforcement.  However, the City has no such legal authority, because federal law preempts state or local law that has the effect of regulating railroad transportation and safety.

        At the March 1, 2018 hearing, counsel for the City made a statement that the Court should not consider the question of preemption, because this action was brought for injunctive relief, and not for a declaration of rights.  However, such a position is clearly without merit.  Where a party is acting within its rights, that party is not required to first seek

declaratory judgment confirming its right, and then pursue relief based on that judgment. As in any case, the Court is empowered to make a determination of issues of law as part of its adjudication of claims… the issue need not first be presented for a declaration of rights. Here, the City has suggested that this Court may not consider the issue of preemption because it has not been presented by CSXT to the Court for express declaratory judgment. However, the issue of preemption rests squarely at the heart of CSXT's claims for injunctive relief and does not require a separate count for declaratory judgment. The City seeks to enforce the 1966 Ordinance and 1979 Agreed Order to control CSXT's operations. Paragraph 39 of CSXT's Complaint expressly alleged that the City lacked legal authority for such action due to federal preemption under the Interstate Commerce Commission Termination Act ("ICCTA") and the Federal Rail Safety Act ("FRSA"). CSXT seeks injunctive relief to prevent the City from engaging in actions for which it has no legal right and which are causing (and threaten to cause) irreparable harm to CSXT.

In 1995, the United States Congress enacted the ICCTA and in doing so expressly preempted state laws regulating rail transportation. 49 U.S.C. § 10501(b) ("Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law"). Congress passed the ICCTA to "build[ ] on the deregulatory policies that have promoted growth and stability in the surface transportation sector." *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 804 (5th Cir. 2011) (alteration in original). The ICCTA expressly preempts a state law claim where it "directly attempts to manage or govern a railroad's decisions in the economic realm." 635 F.3d at 807. To the extent that the City has threatened to enforce by contempt of court the 1979 Agreed Order, and to enforce by police

action the 1966 Ordinance, such is an exercise of enforcement under state law that would "attempt to manage or govern" CSXT's decisions with respect to the maintenance of its tracks.

Claims which seek to restrict or control a railroad's maintenance activities clearly "directly relate to railroad operations." *In re Katrina Canal Breaches Consolidated Litigation*, 05-4182, 2009 WL 224072, at *6 (E.D. La. Jan. 26, 2009) ("claims of negligence resulting from the design and construction of the railroad crossing relate directly to CSXT's operations at the railroad crossing"). "[D]esigning, constructing, and maintaining an active rail line [are] actions that clearly are part of 'transportation by rail carriers and therefore subject to the [STB's] exclusive jurisdiction under § 10501(b).'" *Thomas Tubbs, et al. – Pet. For Declaratory Order*, STB. No. FD 35792, 2014 WL 55 08153, at *4 (S.T.B. served Oct. 31, 2014) ("state and local regulation of actions based on the railroad's design, construction, and maintenance standards for railroad track are preempted under § 10501(b)"). Because enforcement of the 1966 Ordinance and 1979 Agreed Order would "seek to manage or govern railroad operations, allowing them to go forward would unreasonably interfere with rail transportation." *Id.* at *5.

The City here argues that CSXT should be compelled to maintain its tracks in a specific manner as dictated by the City. Courts have regularly found ICCTA preemption of tort claims that would seek to impose a state-law mandated standard of maintenance. *See, e.g., Jie Ao & Xin Zhou – Pet. for Declaratory Order*, S.T.B. No. FD 35539, 2012 WL 2047726, at *7 (S.T.B. served June 6, 2012) (claims preempted if they would "affect the amount and type of maintenance that could be performed on [a] railroad ROW"); *Maynard v. CSX Transp.*, 360 F. Supp. 2d 836 (E.D. Ky. 2004) (ICCTA preempted claims that railroad failed to maintain

drainage on a railcrossing). "Maintaining an active rail line" necessarily entails "actions"—such as methods of track maintenance —"that clearly are part of transportation by rail carriers," hence ICCTA's large preemptive scope. *Tubbs v. Surface Transp. Bd.*, 812F.3d 1141, 1146 (8th Cir. 2015) (internal quotation marks omitted). As such, state law claims that would have the effect of controlling railroad maintenance are preempted by federal law.

In addition, the City has been heard to argue that the 1979 Agreed Order should be binding on CSXT, regardless of the impact of preemption, because it was an agreed order voluntarily entered into to terminate the 1979 litigation. However, such a position ignores two points. First, CSXT was not the party to that 1979 lawsuit and the 1979 Agreed Order. That was litigation undertaken by CSXT's predecessor, L&N. Second, the agreed order was entered in 1979, years before the ICCTA was enacted. It is senseless to suggest that the parties to the 1979 lawsuit contemplated, or intended, that the disposition of that suit would preclude the applicability of a federal law that was not enacted until 1995. ICCTA preemption applies to predating court orders as equally as it does to predating state statutes. Preemption applies to preclude their enforcement.

It is also well-established that the ICCTA directly preempts existing municipal ordinances that have the effect of regulating railroad transportation. See *Tex. Cent. Bus. Lines Corp. v. City of Midlothian*, 669 F.3d 525, 533 (5th Cir. 2012) (finding city ordinances setting zoning height restrictions and embankment limits were preempted) ("If the Board directly regulates the activity, as it does the construction of rail lines, state and local regulation is prohibited. Thus, the ordinances that would apply to the slope or other features of the embankments for the railroad tracks themselves are expressly preempted throughout the 243 acres"). That case also made clear that laws that "dictate[] the construction design and layout

of railroad tracks would frustrate economic decision making." *Id. See, too*, *City of Seattle v. Burlington N. R.R.*, 41 P.3d 1169, 1172 (Wash. 2002) ("The language of the ICCTA is unambiguous. Congress gave the ICCTA broad preemptive power to enable uniform regulation of interstate rail operations, which includes regulation over rail car switching activities. Seattle's ordinances 11.66.080 and 11.66.100 [limiting switching activities from blocking or interfering with crossing traffic] are preempted by the ICCTA."); *Padgett v. Surface Transp. Bd.*, 804 F.3d 103, 107 (1st Cir. 2015) ("It is well established that the ICCTA preempts local as well as state regulation"); *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 160 (4th Cir. 2010) (city ordinances preempted by ICCTA); *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1031 (9th Cir. 1998) ("We believe the congressional intent to preempt this kind of state and local regulation of rail lines is explicit in the plain language of the ICCTA and the statutory framework surrounding it").

Here, the City's position is that the 1966 Ordinance and the 1979 Agreed Order grant it the authority to prohibit CSXT from engaging in any sort of maintenance that would have the effect of raising its tracks, even to meet federal safety standards. Indeed, the City argues that it has the power to direct that CSXT engage in unnecessary "undercutting" in order to avoid slightly raising the tracks at issue to bring them back to their compliance state. However, as the testimony before the Court demonstrated, were undercutting to be employed, the result upon CSXT's rail operations would be significant, causing "major disruptions" in rail traffic for a period of approximately five weeks (as opposed to a single day for the "lift-and-surface" method), and months of modulating rail traffic to ensure safe operations. Testimony established that undercutting can have deleterious effects upon rail integrity and train safety, and is generally an unduly burdensome and inefficient means of addressing

fouled ballast, and for that reason it is not a favored methodology for addressing large-scale track maintenance or specifically crossings.

Insofar as the City asserts that the 1966 Ordinance and 1979 Agreed Order grant the City the authority to restrict CSXT in its decisions as to the manner of construction and maintenance of its tracks, those are expressly preempted. In a recent case before the U.S. District Court for the Southern District of Mississippi, the city of Biloxi sought to bring claims against CSXT alleging improper maintenance of crossings. *Waneck v. CSX Corporation*, 1:17CV106-HSO-JCG, 2018 WL 1546373, at *1 (S.D. Miss. Mar. 29, 2018) ("Plaintiffs allege that CSXT and CSXC failed to properly maintain the Main Street crossing and allowed the roadway on both sides of the tracks to be paved and repaved, resulting in a severe incline or 'hump,' which condition was not repaired to eliminate the hazardous condition"). However, the court dismissed the city's claims, finding that they were preempted by the ICCTA insofar as they encroached upon the railroad's control over track and crossing maintenance under federal regulation:

> In this case, the Amended Complaint and the Cross-Claims assert that CSXT was negligent in its maintenance of the Main Street crossing by adding layer after layer of asphalt patches which ultimately resulted in a dangerous and severely "humped" crossing, and that it was negligent in its operation of its trains over the crossing. Am. Compl. [1-1] at 45, 47-53. CSXT argues that this is tantamount to a claim regarding the design and construction of the crossing, making it subject to preemption under the ICCTA. The Court agrees. It is readily apparent that the resolution of Plaintiffs' and Ambrose's claims against CSXT for negligence arising out of the alleged "improper maintenance" of the Main Street crossing rests entirely upon underlying issues of the crossing's design, construction, and configuration. These are the sort of claims Congress intended the ICCTA to preempt, namely state law claims that directly attempt to manage or govern a railroad's decisions in the economic realm such as the construction and operation of tracks, scheduling, a train's length or speed, or how long a train may occupy a crossing

*Id.*, at *5.  The same is true of the City's position here, i.e. that the enforcement of the 1966 Ordinance and 1979 Agreed Order is tantamount to an attempt to control CSXT's decisions with respect to the "design, construction, and configuration" of its tracks and crossings.  Because the City has no legal basis for asserting that the 1966 Ordinance or 1979 Agreed Order remained valid with the 1995 enactment of ICCTA, CSXT is entitled to permanent injunctive relief barring the City from enforcing those restriction or any other local or state law action that interferes with CSXT's operations.

        The 1966 Ordinance and 1979 Agreed Order are also preempted under the FRSA, 49 U.S.C. § 20101, et. seq.  The FRSA was adopted in 1970 for the express purpose of ensuring that all "laws, regulations, and orders" relating to railroad safety "shall be uniform to the extent practical."  49 U.S.C. § 20106(a).  The FRSA expressly preempts state and local laws relating to railroad safety once the secretary proscribes a regulation or issues an order "covering the subject matter of the state law requirement."  49 U.S.C. § 20106.  *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344 (2000).  The City's desire to enforce the 1966 Ordinance and 1979 Agreed Order to control CSXT's activities, on the ground that it is required to satisfy local safety standards, is akin to local ordinances that seek to restrict railroad activities within city limits, which have been found to be preempted by federal law.  *CSX Transportation v. City of Plymouth*, 86 F.3d 626, 628 (6th Cir 1996) (Municipal ordinance prohibiting obstruction of street traffic in excess of five minutes was preempted – "individual [local, parish] officials are without authority under the [FRSA] to require the Railroad to meet any safety standard beyond those provided for in the national Act"); *City of Seattle v. Burlington N. R.R.*, *supra*, 41 P.3d 1169, 1172 (Wash. 2002) (City ordinances restricting switching operations were preempted by both the ICCTA and FRSA); *Driesen v. Iowa, Chi. & E. R.R.*

*Corp.*, 777 F. Supp. 2d 1143, 1151 (N.D. Iowa 2011) (holding that Spencer, Iowa's blocked-crossing ordinance was expressly preempted under FRSA); *City of Covington v. Chesapeake & O. Ry.*, 708 F.Supp. 806, 808-809 (E.D.Ky.1989) (FRSA preempted city ordinance regulating the speed of trains within city limits).

Federal regulations relating to rail safety clearly encompasses inspection and maintenance of track conditions. 49 C.F.R. 213.1(a) provides:

> This part prescribes minimum safety requirements for railroad track that is part of the general railroad system of transportation. In general, the requirements proscribed in this part apply to specific track conditions existing in isolation. Therefore, a combination of track conditions, none of which individually amounts to a deviation from the requirements in this part, may require remedial action to provide for safe operations over that track. This part does not restrict a railroad from adopting and enforcing additional or more stringent requirements not inconsistent with this part.

Specifically, 49 C.F.R. 213.63 governs track surface and sets forth specific limits concerning cross level and profile of the track. As testimony made clear, CSXT has adopted guidelines for track inspection and maintenance intended to ensure compliance with requirements of 49 CFR 213. The track safety standards set forth in 49 C.F.R. 213 regulate rail safety and cover the subject matter of this case. As set forth in the Affidavit of CSXT Roadmaster Wayne Roberts, the at-grade crossings at issue in the City of Sebree are required to be raised in order to comply with the above-referenced applicable FRA track safety standards. This is especially true where the effect of the City's asserted enforcement of the 1966 Ordinance and 1979 Agreed Order (i.e. to force CSXT to utilize undercutting methodology) would have significant impact upon CSXT rail traffic patterns and train speed for months following the maintenance. As Courts have also made clear, local ordinances which affect train speed are preempted by federal law. *City of Covington, Ky. v. Chesapeake*

& *Ohio Ry. Co.*, 708 F. Supp. 806, 808 (E.D. Ky. 1989) ("Thus, these regulations preclude 'more stringent local ordinance[s] [regulating speed which] cannot co-exist with the federal regulations'"); *City of Seattle v. Burlington Northern R. Co.*, 145 Wash. 2d 661, 673, 41 P.3d 1169, 1174 (2002) ("These ordinances impact areas of safety regulated by the FRSA because they affect the speed at which trains travel, train length, and trains in physical motion"). Therefore, the 1966 Ordinance and the 1979 Agreed Order are expressly preempted, and the City has no legal authority to undertake their threatened enforcement.

**B.    CSXT Shall Suffer Irreparable Injury**

The affidavit of CSXT's Roadmaster Wayne Roberts, Jr. established that failure to repair CSXT's tracks carries attendant risks both to the cost and efficiency of ongoing railway operations of CSXT and to the safety of CSXT and the public.   The testimony before the Court equally established that the current track conditions have fallen out of compliance with FRA regulations and require repair, and that as between the two options of "undercutting" versus "lift-and-surface", the former poses significant burdens on CSXT's rail operations.   These include increased costs, decreased effectiveness over time, and loss of efficiency attendant to forcing CSXT to alter the speed and manner of operations of its trains that pass through the City.    In addition, the condition of the track and track bed following undercutting would unnecessarily raise increased risks of track buckling, posing safety risks of damage to vehicles or personnel and derailment, resulting in injury to CSXT personnel operating on the Railroad Property as well as the public at large.   CSXT's proposed "lift-and-surface" maintenance, on the other hand, eliminates such risks.

**C.    Entry of a Permanent Injunction Will Not Cause Harm to Others**

The issuance of a permanent injunction will not cause substantial harm to others, and merely protects CSXT's rights with respect to its property and its rail operations.

As a result of federal preemption, the City has no legal or equitable authority to restrict or control the manner of CSXT's maintenance of track at the crossings on the Railroad Property, and therefore the City will suffer no legitimate harm from entry of a permanent injunction that merely prohibits it from seeking enforcement of the 1966 Ordinance or the 1979 Agreed Order.   In addition, CSXT has proposed closing crossings that would allow the City to ameliorate any potential safety concerns without affecting access to the public, but the City has balked at consideration of such alternatives.

### D.        The Entry of a Permanent Injunction Will Serve the Public Interest

Prohibiting CSXT's necessary maintenance of the track at its crossings poses risk of injury, collision, derailment or other public harm.   The City is simply not legally permitted to dictate how CSXT complies with federal law to maintain its track and safely conduct rail operations by requiring the use of undercutting rather than CSXT's standard "lift-and-surface" method.   Consequently, the entry of a permanent injunction will serve and protect the public by allowing the maintenance to proceed in the interest of preserving safe railroad operations at these crossings.

## IV. <u>CONCLUSION</u>

In view of the City's stated intention to enforce the 1966 Ordinance and 1979 Agreed Order, by criminal law enforcement and court contempt proceedings, and in light of the safety concerns at issue, as well as the clearly unreasonable interference with CSXT's railroad operations that restricting CSXT's crossing maintenance construction activities would pose, injunctive relief is necessary to peaceably prevent the City from engaging in such activities. In view of the foregoing, and in light of the evidence before the Court, the Plaintiff CSXT respectfully requests that the Court enter a permanent injunction prohibiting the City from taking any action to enforce either the 1966 Ordinance or the 1979 Agreed Order or otherwise interfere with CSXT's railroad operations.

BOEHL STOPHER & GRAVES, LLP


*/s/ Rod D. Payne*
Rod D. Payne
Earl Martin
400 West Market Street, Suite 2300
Louisville, KY 40202
Phone: (502) 589-5980
Fax: (502) 561-9400
rdpayne@bsg-law.com
COUNSEL FOR PLAINTIFF,
CSX TRANSPORTATION, INC.

1601481.1